UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

| | |
|---|---|
| WILLIAM WALT PETTIT, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE BILTMORE FINANCIAL GROUP, INC., ET AL., <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN ALLEN, et al., <br><br> Defendants. | Case No.: |

## RECEIVER'S COMPLAINT AGAINST CERTAIN BILTMORE INVESTORS

COMES NOW, William Walt Pettit, in his capacity as Receiver for the Biltmore Financial Group, Inc., et al. (hereinafter "Plaintiff") and files his Complaint against those persons identified in that Appendix attached hereto and filed concurrently herewith (hereinafter "the Biltmore Investors"). In support, Plaintiff respectfully states as follows:

### SUMMARY

1. The ultimate purpose of this Receivership is to make the "maximum disbursement to claimants" of the Biltmore Financial Group, Inc. (hereinafter "BFG"). Therefore, the Receiver must maximize the pool of assets available for distribution by taking control of all assets of and traceable to the Receivership Estate, as hereafter defined, wherever located.

2. The Receiver's investigation to date reveals sales of unregistered securities generated all of the income for Defendants Biltmore Financial Group, Inc., J.V. Huffman, Jr., and Relief Defendant Gilda Bolick Huffman (hereinafter collectively "Biltmore Defendants"). No revenue or profits received by the Biltmore Defendants were derived from lawful activities or investments. Revenues generated by sales of unregistered securities to new investors funded the BFG network, including salaries of employees, the extravagant

1

lifestyles for J.V. Huffman, Jr. and his family, and proceeds delivered to investors in the form of purported interest payments, bonuses and principal redemptions of the BFG unregistered securities ("Proceeds").

3. The Biltmore Investors identified in the Appendix attached hereto received from BFG funds in excess of their purported investments in BFG unregistered securities.[1] Proceeds received by the Biltmore Investors from BFG were not the actual principal and/or interest from funds invested. Rather, funds used to make payments of Proceeds came directly from the sale of BFG unregistered securities to other investors.

4. When the Biltmore Defendants delivered Proceeds to the Biltmore Investors, they did no more than deliver funds from other investors. For the more than 350 investors who have thus far received little or nothing from their investment in BFG unregistered securities, funds recovered by the Receiver will likely constitute the substantial portion of any funds paid in restitution. The Proceeds are stolen money and should not be retained by the Biltmore Investors, but delivered to the Receivership Estate for distribution.

5. The Receiver has identified substantial sums of Proceeds paid to the Biltmore Investors and, through this Complaint, seeks the return of those funds to the Receivership Estate in order to make an equitable distribution to claimants. At a minimum, the Biltmore Investors named in the Appendix received over $6.3 million in Proceeds.

6. The Receiver seeks an order that: (a) Proceeds received directly or indirectly by the Biltmore Investors were fraudulent conveyances or, in the alternative, unjustly enriched the Biltmore Investors; (b) Proceeds received directly or indirectly by the Biltmore Investors from the sale of fraudulent, unregistered securities are property of the Receivership Estate and are held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) each of the Biltmore Investors is liable to the Receivership Estate for an amount equaling the Proceeds he, she, or it received; and (d) awards attorney's fees and costs to the Receiver.

---

[1] Prior to filing this Complaint, the Receiver contacted the Biltmore Investors named herein for whom he had contact information and offered to settle the claims against them in exchange for payment of the amounts they received in excess of their investments in BFG securities. The Receiver made similar offers to other investors who accepted the Receiver's offer prior to the filing of this Complaint. The Receiver believes that continued discussions with many of the Biltmore Investors named herein will result in additional settlements and dismissals of claims against those investors.

2

## PARTIES

7. William Walt Pettit is the Receiver appointed for The Biltmore Financial Group, Inc. and J.V. Huffman, Jr. in Civil Action No. 08-CV-00136-RLV-CH, styled *Securities and Exchange Commission v. The Biltmore Financial Group, Inc. and J.V. Huffman, Jr., Defendants and Gilda Huffman, Relief Defendant*, pending before the United States District Court for the Western District of North Carolina, Statesville Division, the Honorable Richard L. Voorhees presiding ("the SEC Action").

8. The Biltmore Investors named in the Appendix attached hereto and filed concurrently herewith are citizens and residents of the state and county so indicated and will be served pursuant to the Federal Rules of Civil Procedure, through their attorneys of record, or by other means approved by order of this Court.

## JURISDICTION & VENUE

9. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

10. Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

## STATEMENT OF FACTS

11. On November 12, 2008, the United States Securities and Exchange Commission ("SEC") commenced a lawsuit in the above styled Court against the Biltmore Defendants. On the same date, the Court entered an Order appointing William Walt Pettit as Receiver over all property, assets, and records of the Biltmore Defendants ("Receivership Estate").

12. As alleged by the SEC, the Biltmore Defendants fraudulently marketed unregistered securities to investors exclusively through BFG.

13. The Biltmore Defendants orchestrated and operated a Ponzi scheme since 1991.

14. In marketing, selling, and issuing unregistered securities to investors, the Biltmore Defendants repeatedly touted the unregistered securities' safety and security and BFG's consistent, double-digit returns on its investment portfolio.

15. Contrary to the Biltmore Defendants' representations regarding the pooling of

investors' funds to purchase and sell mortgages for a profit, BFG did not invest in a well-diversified portfolio of highly marketable securities. Instead, the majority of BFG's portfolio was misappropriated by J.V. Huffman, Jr. and was used to finance J.V. Huffman, Jr.'s lavish lifestyle *(e.g.,* a luxury motor coach, a yacht, other pleasure craft, luxury cars, homes, travel, credit cards, etc.).

16. In an effort to conceal the fraud and ensure that investors continued to purchase the unregistered securities, the Biltmore Defendants fabricated the performance of BFG's investment portfolio and misrepresented that the investments were insured against loss.

17. BFG's financial statements, including its investment income, were fictional.

18. Proceeds from the Ponzi scheme were transferred by the Biltmore Defendants to the Biltmore Investors solely for the purpose of concealing and perpetuating the fraudulent scheme. Proceeds paid to the Biltmore Investors were supplied by other investors purchasing the fraudulent, unregistered securities.

19. The Biltmore Defendants perpetuated the fraud by using funds from continuing sales of BFG unregistered securities to fund the payment of purported interest and principal redemptions of pre-existing unregistered securities. In late 2008, redemptions of unregistered securities increased to the point that new sales of unregistered securities were inadequate to cover redemptions and operating expenses. With the depletion of liquid assets, the Ponzi scheme collapsed.

## REQUESTED RELIEF

20. This Court appointed William Walt Pettit as Receiver for the "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated, of Biltmore Defendants." See the Order Appointing Receiver, entered by this Court on November 12, 2008, in the SEC Action at Section V.

21. Section VII of the aforesaid Order Appointing Receiver authorizes the Receiver to "take custody, control and possession of all records, assets, funds, property premises and other materials of any kind in the possession of or under the direct control of the Receiver Estate". Section VIII of the Order specifically authorizes the Receiver to "file and prosecute any civil action or other proceeding [in this Court]" and to "impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."

22. One of the Receiver's duties is to maximize distributions to defrauded investors and other claimants. *See Scholes v. Lehmann,* 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.,* 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust,* 222 F.R.D. 660, 669 (D. Kan. 2004). Before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Receivership Estate or assets traceable to the Receivership Estate.

23. The Biltmore Investors received funds they may have believed was a return on an investment placed with what they thought was a legitimate investment group. In reality, the Proceeds received the Biltmore Investors was not their money, was not a return on their investments, and was not generated by any other lawful business ventures of BFG.

24. The Proceeds were funds which came from the more than 350 holders of unregistered securities who were deceived into purchasing unregistered securities and who by chance, or as the result of sales tactics by BFG financial advisors and other employees, failed to withdraw funds from BFG prior to the date the Receivership was established. Proceeds received by the Biltmore Investors must be returned to the Receivership Estate to compensate victims of the fraud according to principles of law and equity.

25. The Biltmore Investors received Proceeds in the amounts associated with their names as set forth in the Appendix attached hereto. Each of the Biltmore Investors received Proceeds in excess of the amounts paid to purchase the BFG unregistered securities. In aggregate, the Biltmore Investors received approximately $1.2 million more in Proceeds than invested.

### I. *The Receiver is Entitled to Disgorgement of Proceeds Fraudulently Transferred to the Biltmore Investors*

26. The Receiver is entitled to disgorgement of all Proceeds paid to the Biltmore Investors because such payments constitute fraudulent transfers. The Biltmore Defendants transferred Proceeds to the Biltmore Investors with the actual intent to hinder, delay, or defraud their creditors. As a result, the Receiver is entitled to the disgorgement of those Proceeds from the Biltmore Investors.

27. The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "Under the UFTA, transfers made from a Ponzi scheme are presumptively made

5

Case 5:11-cv-00158-RLV-DSC   Document 1   Filed 10/27/11   Page 5 of 9

with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky,* 247 Fed. Appx. 583, 586, (5th Cir. 2007); *see also Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006). The uncontroverted facts establish that the Biltmore Defendants were operating a Ponzi scheme and, to perpetuate the scheme, paid the Biltmore Investors Proceeds taken from other BFG unregistered securities investors. The Receiver is, therefore, entitled to disgorgement of the fraudulently transferred Proceeds received by the Biltmore Investors.

28. The burden is on the Biltmore Investors to establish an affirmative defense, if any exist, of both objective good faith and provision of reasonably equivalent value. *See, e.g., Scholes,* 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). The Receiver is, therefore, entitled to recover the full amount of Proceeds the Biltmore Investors received, unless the Biltmore Investors prove *both* objective good faith *and* reasonably equivalent value.

29. The good-faith element of the affirmative defense requires the Biltmore Investors prove objective, not subjective, good faith. *Warfield v. Byron,* 436 F.3d 551, 559-560 (5th Cir. 2006). In addition, the case law is uniformly clear that reasonably equivalent value can never be proven as to amounts received in excess of investments. *See Donell v. Kowell,* 533 F.3d 762, 776 (9th Cir. 2008) ("We are aware that it may create a significant hardship when an innocent investor such as Kowell is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent. Nevertheless, courts have long held that is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell."); *see also Scholes v. Lehmann,* 56 F.3d 750, 757-58 (7th Cir. 1995) ("He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment-the difference between what he put in at the beginning and what he had at the end.").

30. Additionally, the Receiver requests reasonable attorney's fees and costs for prosecuting these fraudulent-transfer claims against the Biltmore Investors.

31. In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of all Proceeds received by the Biltmore Investors.

6

32. The Biltmore Defendants, who orchestrated the Ponzi scheme, transferred the Proceeds to the Biltmore Investors with actual intent to hinder, delay, or defraud their creditors. The Receiver is, therefore, entitled to disgorgement of all Proceeds fraudulently transferred to the Biltmore Investors. Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that the Proceeds received directly or indirectly by the Biltmore Investors were fraudulent conveyances; (b) declaring that Proceeds received directly or indirectly by the Biltmore Investors are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) declaring that each of the Biltmore Investors is liable to the Receivership Estate for an amount equaling the amount of Proceeds he, she, or it received; and (d) awarding attorney's fees and costs to the Receiver.

## II. *In the Alternative, the Receiver is Entitled to Disgorgement of Proceeds from the Biltmore Investors under the Doctrine of Unjust Enrichment*

33. The allegations of the foregoing paragraphs 1 through 32 are incorporated herein by reference.

34. The Biltmore Investors received Proceeds in excess of the purchase amount of the unregistered securities of BFG.

35. The Biltmore Investors hold Proceeds obtained as a result of the fraudulent actions of the Biltmore Defendants, and such Proceeds in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors.

36. The Biltmore Investors have received a non-gratuitous benefit in the form of the Proceeds and the Receiver is entitled to disgorgement of the Proceeds paid to the Biltmore Investors pursuant to the doctrine of unjust enrichment.

37. Pursuant to the equity powers of this Court, the Receiver seeks an order (a) establishing that each of the Biltmore Investors were unjustly enriched by receiving Proceeds directly or indirectly from the Biltmore Defendants; (b) declaring that Proceeds received directly or indirectly by the Biltmore Investors are property of the Receivership Estate and are held pursuant to a constructive trust for the benefit of the Receivership Estate; and (c) declaring that each of the Biltmore Investors is liable to the Receivership Estate for an amount equaling the amount of Proceeds he, she, or it received; and (d) awarding attorney's fees and costs to the Receiver.

## PRAYER

The Receiver respectfully requests the following:

a) An Order providing that Proceeds received directly or indirectly by the Biltmore Investors were fraudulent conveyances under applicable law or, in the alternative, that the Biltmore Investors were unjustly enriched with Proceeds received directly or indirectly from the sale of fraudulent, unregistered securities;

b) An Order providing that Proceeds received directly or indirectly by the Biltmore Investors from the sale of fraudulent, unregistered securities are property of the Receivership Estate;

c) An Order providing that Proceeds received directly or indirectly by the Biltmore Investors from the sale of fraudulent, unregistered securities are subject to a constructive trust for the benefit of the Receivership Estate;

d) An Order establishing the amount of Proceeds received by each of the Biltmore Investors;

e) An Order providing that each of the Biltmore Investors is liable to the Receivership Estate for an amount equaling the Proceeds received from the sale of fraudulent, unregistered securities;

f) An award of costs, attorney's fees, and prejudgment interest; and

g) Such other and further relief as the Court deems proper under the circumstances.

Respectfully submitted.

This the 27th day of October, 2011.

ROGERS TOWNSEND & THOMAS, PC
Attorneys for the Receiver

By: *[signature]*
William F. Kirk
N.C. Bar No. 34390
2550 West Tyvola Road, Suite 520
Charlotte, NC 28217
Telephone (704) 442-9500
Telecopier (704) 442-8453

8

| Appendix | William Walt Pettit, as Receiver, v. Stephen Allen, et al. | | |
|---|---|---|---|
| Defendants | Defendants' County of Residence | Proceeds Received in Excess of Investments (False Profits) | Total Proceeds Received |
| Stephen Allen and Jane Allen | Onslow | $ 144,622.60 | $ 289,174.98 |
| Paul Barringer and Alma Barringer | Catawba | $ 44,679.00 | $ 289,786.95 |
| Gracie Bolick | Catawba | $ 54,408.89 | $ 85,452.23 |
| Phyllis Bollinger | Catawba | $ 10,559.16 | $ 185,559.16 |
| Mary K. Bradshaw | Catawba | $ 55,700.00 | $ 407,200.00 |
| Charles Bradshaw and Donna Bradshaw | Catawba | $ 20,469.50 | $ 290,600.00 |
| Lewis Hollar, Linda Hollar, Betty Bostian and Cathy Hollar | Onslow | $ 49,862.00 | $ 130,297.00 |
| Hal Houston and Betty Houston | Onslow | $ 102,055.57 | $ 485,061.49 |
| Tommy Houston and Martha Houston | Catawba | $ 99,969.68 | $ 495,309.02 |
| George Huffman and Mary Huffman | | $ 58,214.33 | $ 473,717.64 |
| Huffman Racing, Inc. | Catawba | $ 100,338.00 | $ 319,338.00 |
| Jonathan Lehman | King, NC | $ 42,549.86 | $ 42,549.86 |
| Janie Leonard and Bruce Leonard | Wake | $ 95,000.00 | $ 170,000.00 |
| Phyllis Little | Onslow | $ 30,374.85 | $ 48,374.85 |
| Measured Dose, Inc. | Catawba | $ 3,169.00 | $ 417,588.00 |
| Steve McRary and Mary McCrary | Onslow | $ 42,500.00 | $ 44,500.00 |
| Janis Mixon | Catawba | $ 59,634.00 | $ 171,318.88 |
| Evan Reece | Burlington, NJ | $ 76,500.00 | $ 76,500.00 |
| Dennis Setzer and Darla Setzer | Catawba | $ 9,750.00 | $ 786,750.00 |
| Jeffrey Sigmon and Aundrea Sigmon | Alexander | $ 39,520.00 | $ 429,520.00 |
| Beulah Sipe and Martha Houston | Catawba | $ 19,729.00 | $ 124,729.00 |
| | Total: | $ 1,159,605.44 | $ 5,763,327.06 |